# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>**Plaintiff**,<br><br>v.<br><br>CRISTIAN SERRANO-DELGADO [3],<br><br>**Defendant**. | **Criminal No.** 17-533 (FAB) |

## OPINION AND ORDER

BESOSA, District Judge.

Before the Court is defendant Cristian Serrano-Delgado ("Serrano")'s post-trial motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 ("Rule 29"). (Docket No. 229.) For the reasons set forth below, Serrano's Rule 29 motion is **DENIED**.

## I. Background

The Court summarizes the key facts in the light most favorable to the jury's verdict and in a manner consistent with the trial record. United States v. Valerio, 676 F.3d 237, 240 (1st Cir. 2012); United States v. Polanco, 634 F.3d 39, 40 (1st Cir. 2011).

On the night of September 11, 2017, Serrano departed from the Dr. Pila Public Housing Project in Ponce, Puerto Rico, with Jonathan Valentín-Santiago ("Valentín") and Rubén Miró-Cruz ("Miró") in his white BMW with dark, tinted windows. (Docket

No. 195 at pp. 6, 8, 70-71.) Serrano drove Valentín and Miró to Aqua Marina Street in Ponce, passing in front of Herol Café, also known as "La Tumba," three times within four minutes. (Docket No. 222 at pp. 57-60.) After the third pass, Serrano stopped his BMW approximately 500 feet from La Tumba and "made as though he was looking for something in the trunk" while Valentín and Miró exited the vehicle and walked toward La Tumba. (Docket No. 195 at pp. 70-71.) Valentín and Miró wore handkerchiefs covering their faces as they approached the establishment. (Gov. Ex. 1G.)

Outside La Tumba, Valentín brandished a firearm and Miró brandished a knife, and they announced a robbery. (Gov. Ex. 1G.) They demanded money. (Docket No. 195 at p. 29.) The owner of La Tumba, who was sitting at a table outside the establishment playing dominos with three other men, placed money from La Tumba's sales on the table. Id. at pp. 28-29. An individual sitting at the domino table with the owner removed a chain from around his neck and handed the chain to Miró. (Gov. Ex. 1G.)

Valentín entered the billiards area of La Tumba and Miró stood watch outside. (Gov. Exs. 1B and 1G.) Valentín encountered Roberto Medina-Mariani ("Medina"), an off-duty police officer, along with Medina's friend. (Docket No. 194 at p. 12.) Valentín aimed the firearm at Medina and his friend and demanded that they surrender their belongings. Id. at pp. 12-13. Medina's friend

surrendered Medina's cellular device, and Medina "put up his hands" and "took out the money he had in his pocket," placing the money on the billiards table. Id. at p. 12. Medina attempted to exit La Tumba, but Valentín "pulled him by his shirt . . . back into the establishment." Id. at p. 13. Medina then took out his own firearm and shot Valentín several times, wounding Valentín. (Gov. Ex. 1B.) Valentín shot back, mortally wounding Medina. Id.

After the first shots, Miró sprinted from La Tumba in the direction of Serrano's BMW. (Docket No. 195 at p. 30.) Valentín followed, running from La Tumba with hunched posture. (Gov. Ex. 1A.) Valentín fired shots toward La Tumba as he retreated to the BMW. (Docket No. 195 at pp. 7-8, 36.) The owner of La Tumba took possession of Medina's firearm and returned fire. Id. at p. 32. Valentín and Miró entered the BMW and Serrano sped off toward Jardines del Caribe in Ponce. Id. at p. 9; Docket No. 222 at pp. 64-65.

On the way to Jardines del Caribe, Serrano "hit a hole and got a flat tire," but ultimately arrived at Jardines del Caribe. (Docket No. 222 at p. 46.) During the drive, Valentín was "saying that he was dying." Id. At Jardines del Caribe, Serrano and Miró left a wounded Valentín on 19th Street at the side of the road. Id. at p. 64. Serrano parked the BMW on 21st Street and called his mother, who picked him up at a nearby bridge and drove him

back to the Dr. Pila Public Housing Project. Id. at pp. 47-48, 65.

Serrano returned to Jardines del Caribe with his brother and his girlfriend. (Docket No. 195 at p. 74.) Serrano used rags to clean Valentín's blood from inside his BMW and discarded the bloodied items behind the wall of an abandoned house. Id. at pp. 48-50, 66-68. Later, police officers observed Serrano, shirtless, changing the tire of the BMW. (Docket No. 194 at p. 69.) The officers took Serrano, his brother, and his girlfriend into custody. Id. at p. 71.

Meanwhile, on the date of the robbery and the shooting, Puerto Rico Police had set up cones and a perimeter around La Tumba and were working with forensics and homicide specialists at the scene. (Docket No. 193 at pp. 27-31; Docket No. 195 at pp. 67-68; Gov. Exs. 71, 115.) Medina's body remained inside the establishment while the officers investigated the crime. (Gov. Ex. 71.) No sales were made at La Tumba after the robbery and shooting that day or later. (Docket No. 195 at p. 44.) The robbery halted La Tumba's commercial activities on the very day of the robbery and shooting, and the establishment never reopened after the attack. (Docket No. 195 at pp. 38.)

The next morning, FBI agents interviewed Serrano at the Ponce Drug Division. (Docket No. 195 at p. 69.) Serrano admitted that:

(1) he left the Dr. Pila Public Housing Project with Valentín and Miró and drove to La Tumba; (2) he parked down the street from La Tumba; (3) he "made as though he was looking for something in the trunk" while Valentín and Miró approached La Tumba; (4) he heard gunshots, after which Valentín and Miró returned to the BMW; (5) he abandoned Valentín, wounded, on the side of 19th Street in Jardines del Caribe; (6) he cleaned Valentín's blood from the BMW; and (7) Miró took the firearm. Id. at pp. 70-75; Docket No. 196 at pp. 4-8.

On May 15, 2018, a federal grand jury returned a superseding indictment that charged Serrano, Valentín, and Miró with: (1) conspiring to interfere with commerce by robbery in violation of 18 U.S.C. § 1951 ("section 1951"); (2) interference with commerce by robbery in violation of section 1951; (3) discharge of a firearm during and in relation to a crime of violence resulting in death, in violation of 18 U.S.C. § 924(j); and (4) discharge of a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(iii). (Docket No. 101.)

Following trial, the jury found Serrano guilty of all four offenses on December 17, 2018. (Docket No. 206.) On January 31, 2019, Serrano moved for a judgment of acquittal pursuant to

Rule 29.  (Docket No. 229.)[1]  According to Serrano, (1) the United States failed to present sufficient evidence to satisfy the jurisdictional element of a section 1951 violation; (2) the United States failed to present sufficient evidence to support a finding that Serrano aided and abetted in the commission of a robbery in violation of section 1951; (3) a conspiracy to interfere with commerce by robbery and interference with commerce by robbery are not crimes of violence upon which violations of 18 U.S.C. § 924(c)(1)(A)(iii) and 18 U.S.C. § 924(j) may be predicated; and (4) Serrano is entitled to a new trial because the United States misrepresented facts to the jury during its rebuttal and improperly appealed to the jurors' emotions.  Id.  The United States opposed Serrano's Rule 29 motion.  (Docket No. 244.)

## II.  Rule 29 Legal Standard

A court may set aside a jury's guilty verdict and enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction.  See Fed.R.Crim.P. 29.  In reviewing a motion for judgment of acquittal, a court must consider

---

[1] A defendant may move for judgment of acquittal within fourteen days after a guilty verdict or after the discharge of the jury, whichever is later. Fed.R.Crim.P. 29(c)(1).  In this case, the jury reached a verdict on December 17, 2018.  (Docket No. 206.)  The Court granted Serrano's motions for extensions of time to file his motion for a judgment of acquittal by January 31, 2019.  (Docket Nos. 213 and 220.)  Serrano moved for a judgment of acquittal on January 31, 2019.  (Docket No. 229.)  Accordingly, Serrano's Rule 29 motion is timely.

the evidence "in the light most favorable to the prosecution" and determine whether the "body of proof, as a whole, has sufficient bite to ground a reasoned conclusion that the government proved each of the elements of the charged crime beyond a reasonable doubt."  United States v. Lara, 181 F.3d 183, 200 (1st Cir. 1999) (citations omitted).

Rule 29 motions require a court to "take into account all evidence, both direct and circumstantial, and [to] resolve evidentiary conflicts and credibility disputes in favor of the jury's verdict."  Valerio, 676 F.3d at 244.  The First Circuit Court of Appeals has called this sufficiency of evidence challenge "a tough sell," Polanco, 634 F.3d at 45, observing that defendants seeking acquittal on this basis "face an uphill battle."  United States v. Pérez-Meléndez, 599 F.3d 31, 40 (1st Cir. 2010); accord. United States v. Hatch, 434 F.3d 1, 4 (1st Cir. 2006) (referring to the sufficiency of evidence burden as a "daunting hurdle[]") (internal quotation marks omitted).

While the sufficiency of the evidence is at the heart of the Rule 29 inquiry, deference to the jury's verdict informs the Court's analysis.  To uphold the jury's guilty verdict, the Court need only determine that the guilty verdict "finds support in a plausible rendition of the record."  See, e.g., United States v. Shaw, 670 F.3d 360, 362 (1st Cir. 2012).

**III. Discussion**

    **A.    Jurisdictional Element of Section 1951**

Pursuant to section 1951, or the Hobbs Act, it is unlawful to "obstruct[], delay[], or affect[] commerce or the movement of any article or commodity in commerce, by robbery," or to conspire to do so. 18 U.S.C. § 1951(a). "The term 'commerce' means commerce *within* the District of Columbia, or any Territory or Possession of the United States," as well as "all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof." Id. at § 1951(b)(3) (emphasis added). "It is well established that a de minimis interference with commerce is enough to sustain a Hobbs Act conviction." United States v. Rivera-Rivera, 555 F.3d 277, 286 (1st Cir. 2009) (internal citation and quotation marks omitted). "[A] robbery need only have a realistic probability of a de minumus [sic] effect on interstate commerce to bring it within the reach of the Hobbs Act." United States v. Catalán-Román, 585 F.3d 453, 462 (1st Cir. 2009) (internal citation and quotation marks omitted).

The United States presented sufficient evidence to satisfy the jurisdictional element of a section 1951 violation. At trial, the owner of La Tumba testified that the establishment was a bar and restaurant that sold food and imported and

domestically manufactured alcoholic beverages. (Docket No. 195 at p. 24.) The United States showed that Valentín brandished a firearm and Miró brandished a knife on the night of the robbery, and the owner of La Tumba testified that Valentín and Miró demanded money. (Gov. Ex. 1G; Docket No. 195 at p. 29.) The owner of La Tumba testified that in response to their demands, he placed money from La Tumba's sales on the table. (Docket No. 195 at pp. 29 and 35.) He also testified that La Tumba's commercial activities were interrupted by the robbery. Id. at p. 44.

The jury could have found beyond a reasonable doubt that no food or beverages could be sold during the robbery or immediately thereafter due to the armed assailants, death of Medina, and police officers present at the crime scene, and that therefore the robbery had a "realistic probability of a de minimus [sic] effect on interstate commerce." Catalán-Román, 585 F.3d at 462; United States v. Vega-Molina, 407 F.3d 511, 527 (1st Cir. 2005) (finding that "[t]he commission of a violent crime in the workplace inevitably will constitute a wrenching, if unquantifiable, blow to morale and productivity," especially when "the robbery and events associated with it caused the company to close its offices the following day"); see, e.g., United States v. Chaplain, 864 F.3d 853, 858 (8th Cir. 2017) ("Where a business is forced to close for a period of time, a court is especially likely

to find that the robbery affected interstate commerce."); United States v. Davis, 30 F.3d 613, 615 (5th Cir. 1994) (finding the jurisdictional element of a section 1951 violation satisfied when "robberies caused the interruption of commerce" because of "temporary closure" at the affected establishments).

The jury also could have found beyond a reasonable doubt that Valentín and Miró's demand for money derived from La Tumba's proceeds created a realistic probability of depleting La Tumba's assets, even though Valentín and Miró fled without the money. See United States v. Jiménez-Torres, 435 F.3d 3, 9 (1st Cir. 2006) ("Depletion of the assets of a business engaged in interstate commerce is a common method for demonstrating that a robbery had an effect on interstate commerce.").[2]

Serrano's argument that "the evidence presented no intention to commit a robbery targeting the Herold's [sic] Café business" is unavailing. See Docket No. 229 at p. 3. "[T]he government is not required to prove that the defendants intended to affect commerce" to sustain a Hobbs Act conviction. Rivera-

---

[2] Pursuant to Federal Rule of Criminal Procedure 31(c), "A defendant may be found guilty of . . . an attempt to commit the offense charged[] or an attempt to commit an offense necessarily included in the offense charged, if the attempt is an offence in its own right." Fed.R.Crim.P. 31(c). Section 1951 criminalizes attempted and completed robberies. 18 U.S.C. § 1951(a). Moreover, "attempt is a lesser-included offense of the completed crime and need not be charged at all" in the superseding indictment. United States v. D'Amico, 496 F.3d 95, 99 (1st Cir. 2007). The jury in this case was therefore entitled to convict Serrano of an attempted Hobbs Act robbery.

Rivera, 555 F.3d at 290; see also Jiménez-Torres, 435 F.3d at 10 (holding that the defendant "may not have intended to cause these effects [on commerce] but his intent is irrelevant to establishing the commerce element of a Hobbs Act offense"). Indeed, robbery of personal property at a commercial establishment satisfies the jurisdictional element of section 1951 if the robbery causes an interruption to commerce. Vega-Molina, 407 F.3d at 527 (holding that the government can satisfy the jurisdictional element of a Hobbs Act violation by showing that "the perpetrators only took money from [the business'] employees, not from the business").

### B. Aiding and Abetting

To find Serrano guilty of aiding and abetting an offense, the jury must have found beyond a reasonable doubt that Serrano (1) took an affirmative act in furtherance of that offense (2) with the intent of facilitating the offense's commission. United States v. Manso-Cepeda, 810 F.3d 846, 849 (1st Cir. 2016) (citing Rosemond v. United States, 572 U.S. 65, 71 (2014)). To establish aiding and abetting pursuant to 18 U.S.C. § 924(c)(1)(A)(iii) and 18 U.S.C. § 924(j), the United States must have proven Serrano's "advance knowledge," or "knowledge at a time the accomplice [could] do something with it—most notably, opt to walk away." Rosemond, 572 U.S. at 78. "[I]f a defendant continues to participate in a crime after a gun was displayed or used by a confederate, the jury

can permissibly infer from his failure to object or withdraw that he had such knowledge." Id. at 78 n.9.

The United States presented sufficient evidence to support a finding that Serrano aided and abetted in the commission of a robbery in violation of section 1951. The United States submitted: (1) testimony that Serrano used his own BMW to drive Valentín and Miró to Aqua Marina Street, where La Tumba was located; (2) surveillance videos showing Serrano's BMW passing La Tumba three times in four minutes prior to the robbery; (3) testimony and photographic evidence that Serrano parked approximately 500 feet from La Tumba; (4) videos showing Valentín and Miró masked, walking toward La Tumba before the robbery and fleeing La Tumba after the robbery; (5) testimony that Valentín fired shots in the direction of La Tumba before entering Serrano's BMW; (6) testimony that Serrano sped away from the crime scene in his BMW with Valentín and Miró inside the car; and (7) testimony and photographic evidence that Serrano attempted to discard evidence and clean blood from his BMW after the robbery. (Docket Nos. 194-96, 222; Gov. Exs. 1A, 1B, 1G.) The jury could have found beyond a reasonable doubt that Serrano knowingly participated in the planning and execution of the robbery.

The United States also presented sufficient evidence to support a finding that Serrano aided and abetted in the commission

of the weapons violations of 18 U.S.C. § 924(c)(1)(A)(iii) and 18 U.S.C. § 924(j). The United States submitted testimony from a neighbor who observed the shooting from her window. (Docket No. 195 at p. 7.) The neighbor testified that she saw Valentín with his face covered and shooting in the direction of La Tumba prior to entering Serrano's BMW, and that the BMW was "waiting" for Valentín. Id. at pp. 7-9. The jury could have found beyond a reasonable doubt that Serrano had actual knowledge of Valentín's firearm in the moments before Valentín entered the BMW, and that instead of withdrawing from the robbery, Serrano continued his efforts to assist by speeding away from the crime scene with Valentín and Miró inside the car and by attempting to discard evidence at Jardines del Caribe after the robbery.

C.  **Crimes of Violence**

Serrano's contentions that "counts three and four of the superseding indictment should be dismissed" are unavailing. See Docket No. 229 at p. 7. As this Court held in a Memorandum and Order on December 11, 2018, a conspiracy to interfere with commerce by robbery and interference with commerce by robbery are crimes of violence upon which violations of 18 U.S.C. § 924(c)(1)(A)(iii) and 18 U.S.C. § 924(j) may be predicated. See Docket No. 181; United States v. García-Ortiz, 904 F.3d 102, 109 (1st Cir. 2018). "[B]ecause the offense of Hobbs Act robbery has as an element the

use or threatened use of physical force capable of causing injury to a person or property, a conviction for Hobbs Act robbery categorically constitutes a 'crime of violence' under section 924(c)'s force clause." García-Ortiz, 904 F.3d at 109. Moreover, to decide whether a conspiracy to commit a Hobbs Act robbery constitutes a crime of violence pursuant to section 924(c), the Court applies "a case-specific, real-world approach," which requires the jury to consider the "defendant's actual conduct in determining whether a 'crime of violence' has been committed." United States v. Douglas, 907 F.3d 1, 16 (1st Cir. 2018); see id. at 17 ("We are at this point unwilling to say that the question can be resolved as a matter of law.  We think it properly must go to the jury for determination, if there is a trial.").

### D. United States' Closing and Rebuttal Arguments

The United States did not misrepresent facts to the jury during its closing and rebuttal arguments, nor did it improperly appeal to the jurors' emotions.  According to Serrano, the United States "introduced to the Jury[] that [] Serrano was not working and that he liked nice things," and that "[t]his argument was beyond the scope of the Defense's Closing argument and assumed facts that were not in evidence."  (Docket No. 229 at p. 9.) Serrano also argues that "the Government in both their closing [and rebuttal arguments] appealed to the Jury's emotion using the

victim's death and the fact that he was an off-duty police officer." Id. at p. 10. The Court disagrees.

"[C]ourts and jurors are not expected to put their common sense into cold storage." United States v. Rodríguez-Milián, 820 F.3d 26, 32 (1st Cir. 2016). "[T]he prosecution may call[] on the jury to employ its collective common sense in evaluating the evidence and to draw reasonable inferences therefrom" in closing and rebuttal arguments. United States v. Hamie, 165 F.3d 80, 84 (1st Cir. 1999) (alteration in original) (internal quotation marked omitted). During trial, Serrano testified that (1) he was smoking marijuana on September 11, 2017; (2) he owned a white BMW; (3) he had boxes of Jordan sneakers in his trunk; and (4) he was not employed at the time. (Docket No. 222 at pp. 38, 44, 48, 54.) The United States may request that the jury employ common sense and draw reasonable inferences from this testimony to determine Serrano's motive. See Hamie, 165 F.3d at 84; Horton v. Allen, 370 F.3d 75, 85 n.7 (1st Cir. 2004) ("Because the prosecution charged [the defendant] with felony murder []based on [] armed robbery, evidence suggesting that [the defendant's] compatriot had a motive for robbing . . . was relevant to proving the prosecution's theory of the case.") The United States' discussion of motive did not exceed the scope of Serrano's closing argument. Serrano's closing argument addressed Serrano's lack of intent, innocent motive,

innocent action, and lack of knowledge. (Docket No. 223 at pp. 63-69.) The United States fairly challenged Serrano's arguments in its closing and rebuttal arguments.

Finally, Serrano's argument that the United States improperly appealed to the jurors' emotions is unpersuasive. See Docket No. 229 at p. 10. Because Serrano raised no contemporaneous objection during the United States' closing and rebuttal arguments, the Court reviews Serrano's claim of prosecutorial misconduct for plain error. See Fed.R.Crim.P. 52(b); United States v. Acevedo-Maldonado, 696 F.3d 150, 156 (1st Cir. 2012) (internal citation and quotation marks omitted) (holding that in Puerto Rico "the contemporaneous objection rule is, for the most part, strictly enforced, and a belated objection does not cure the original default"); United States v. Wilkerson, 411 F.3d 1, 7 (1st Cir. 2005) ("There was no contemporaneous objection to the closing argument or rebuttal at trial, so we review for plain error."). "Review for plain error requires determining whether an error occurred which was clear or obvious and which not only affected the defendant's substantial rights but also seriously impaired the fairness, integrity, or public reputation of judicial proceedings." Wilkerson, 411 F.3d at 7 (citation omitted).

The United States did not commit clear or obvious error that affected Serrano's substantial rights and seriously impaired

the fairness, integrity, or public reputation of the judicial proceedings.  The United States submitted evidence of Medina's death to establish the "resulting in death" element of the 18 U.S.C. § 924(j) offense, and the fact that Medina was an off-duty police officer was relevant to provide context to Medina's actions at La Tumba and demonstrate Medina's lawful possession of the firearm.  See United States v. Mangual-Santiago, 562 F.3d 411, 428 (1st Cir. 2009) (discussing relevance standard).  Although the United States characterized Medina as a "hero" once in its rebuttal argument, Serrano described Medina in a similar way in his closing argument:

> [W]e saw how [] Medina rightfully protected and exercised his responsibility as a man and as a police officer to protect his friend that was there and himself from the robbery, and he tried to repel the attack.

(Docket No. 223 at pp. 58 and 78.)  The United States did not err by responding to Serrano's similar mention of Medina in its rebuttal argument, and United States' characterization of Medina as a hero did not "seriously impair[] the fairness, integrity, or public reputation of the judicial proceedings."  See Wilkerson, 411 F.3d at 7 (citation omitted).

**IV. Conclusion**

Based on the foregoing analysis, the Court **DENIES** Serrano's Rule 29 motion for judgment of acquittal.  (Docket No. 229.)

**IT IS SO ORDERED.**

San Juan, Puerto Rico, April 16, 2019.

                                                             s/ Francisco A. Besosa
                                                             FRANCISCO A. BESOSA
                                                             UNITED STATES DISTRICT JUDGE